# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00323-CV

---

### D. J. and C. C., Appellants

**v.**

### Texas Department of Family and Protective Services, Appellee

---

### FROM COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 19-0074-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the trial court signed a final order terminating the parental rights of D.J. (Mother) and C.C. (Father) to their children and appointing the Texas Department of Family and Protective Services (the "Department") the children's managing conservator.[1] Father and Mother each filed a notice of appeal.

Mother's attorney has filed a brief explaining that Mother's appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738 (1967). Father's attorney has filed a brief asserting that the evidence is insufficient to support the trial court's findings that statutory grounds for termination exist, *see* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P), and that termination of his parental rights is in the children's best interest, *see id.* § 161.001(b)(2).

---

[1] Four children are involved in this proceeding. Z., who was two years old when the final order was signed, and twins A. and J., who were one year old, are the biological children of Mother and Father; C., who was five, is Mother's child by an unknown father, whose parental rights were also terminated.

Because we agree that Mother's appeal is frivolous and because we conclude, as to Father's parental rights, that the evidence is sufficient to support the trial court's findings that statutory grounds for termination exist under subsections (D) and (E) and its finding on best interest, we will affirm the trial court's order of termination.

## BACKGROUND

On June 4, 2019, the Department received a report from staff at St. David's North Hospital that Father and Mother had failed to discharge their newborn twins, A. and J., from the hospital's neo-natal intensive care unit. The twins had been placed in the neo-natal intensive care unit immediately after their birth at the hospital on May 23, and according to the hospital caseworker, the twins had been cleared for discharge for more than a week. The hospital caseworker also reported that Mother and Father had not been in contact with hospital staff in over a week and that based on conversations with Father, staff members were concerned about Mother's mental health and the parents' lack of transportation. Three days after the report was made, Mother and Father arrived at the hospital, completed the discharge, and took the twins home.

The Department assigned Scott Rector to investigate the matter, and on June 14 and July 3, 2019, Rector met with Mother and Father at their home in Williamson County. Rector testified at trial that during the June 14 visit, he observed that the home was cluttered and that the older children, C. and Z., were "slightly soiled" but that he did not have any serious concerns about the children's safety. Following the second visit, Rector again concluded that although the home was "messy," it did not present a "major safety issue." At the conclusion of

the July 3 visit, Rector informed Mother and Father that they should clean up the house and that he would "return to check again at a later time."

Rector retuned to the home on July 22, 2019, and according to his testimony at trial, Rector observed that the home had deteriorated significantly since his July 3 visit. Specifically, Rector testified that he observed "several bowls of food with mold just thrown about the place in the living area"; "cockroaches and mouse droppings," including around the cribs where the twins were sleeping; "several bags of unidentified substance that looked as it if it was a tobacco-like substance"; and "several drug paraphernalia pipes." Rector considered the home to be a "dangerous living situation at that point."

Another Department investigator, Kasey Minney, was called to the home to assist Rector with the investigation. When she arrived, Minney took photos of the home, which were later admitted into evidence at trial. In addition, Minney testified at trial about her observations and experiences at the home that day, including a conversation she had with Mother's oldest child, C. According to Minney, four-year-old C. approached her outside the home and told her that "Mommy wasn't feeling good" and that "[Mother] was using cans and he wished she would stop because it makes her sick." A short time later, Minney was in the kitchen when she overheard an argument occurring in the bedroom between Mother and her mother (the children's maternal grandmother) in which the grandmother told Mother, "You need to put that away. You are cutting off your own food. They are not stupid. They know what is going on." Minney then heard what sounded like the release of air coming from the bedroom. Minney entered the bedroom and observed Mother attempting to "hide something underneath the blanket next to her." Rector testified that Minney reported this activity to him and that the activity was consistent with statements by family members that Mother was regularly abusing inhalants (also referred to

3

by the parties as "huffing canned air"). Family members also reported that Father was abusing cough syrup, marijuana, and methamphetamines.

That same day, the Department requested an order for protection of the children in an emergency, supported by Rector's affidavit. The trial court signed the order, and the children were removed from the parents' home and placed in foster care. Immediately following their removal, the children were taken to an emergency room for a medical assessment, where it was discovered that all of them had lice and two of them had scabies.

On July 23, 2019, the Department filed its original petition seeking termination of parental rights and conservatorship of the children. The Department's case proceeded to a bench trial on May 18, 2020, and after reconvening, concluded on June 3, 2020. The Department's witnesses included investigators Rector and Minney; the Department caseworker, Lakin Morris; Mother; and Father. At the conclusion of the trial, the trial court found that Mother and Father had each engaged in conduct constituting grounds for termination under Texas Family Code Section 161.001(b)(1)(D), (E), (O), and (P) and that termination was in the best interest of the children. This appeal followed.

## STANDARD OF REVIEW

"While parental rights are of constitutional magnitude, they are not absolute." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). To terminate the parent-child relationship, the party seeking termination must prove by clear and convincing evidence that (1) the parent has engaged in conduct set out as statutory grounds for termination and (2) termination is in the children's best interest. Tex. Fam. Code § 161.001(b)(1), (2); *see In re C.H.*, 89 S.W.3d at 23. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier

4

of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018).

In reviewing the sufficiency of the evidence in parental-termination cases, we apply a standard of review on appeal that reflects this heightened standard of proof, *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002), focusing on whether the evidence is such that a reasonable factfinder could form a firm belief or conviction, *In re C.H.*, 89 S.W.3d at 26 ("A standard [of review] that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role."). In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. In conducting a legal-sufficiency review, a reviewing court "cannot ignore undisputed evidence contrary to the finding," but must otherwise look at the evidence in the light most favorable to the judgment, which means the court must "assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630-31; *In re J.F.C.*, 96 S.W.3d at 266. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.F.C.*, 96 S.W.3d at 266. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the finding and considering undisputed contrary evidence, a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d at 631; *In re J.F.C.*, 96 S.W.3d at 266.

A factual-sufficiency review, in contrast, requires "weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *In re A.C.*, 560 S.W.3d

5

at 631. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

## ANALYSIS

**Father's Appeal**

In five issues on appeal, Father challenges the legal sufficiency of the evidence supporting the trial court's findings that he engaged in conduct justifying termination under subsections (D), (E), (O), and (P) and the factual sufficiency of the evidence supporting the finding that termination of his parental rights is in the children's best interest. We will begin our review by determining whether the evidence is legally sufficient to support the trial court's endangerment findings—that is, whether termination is warranted under subsections (D) and (E). *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (concluding that due process requires appellate courts to review challenged subsections (D) and (E) findings because findings under either of these subsections could be used in future proceedings to terminate parent's rights to other children under subsection (M)).

*Statutory-predicate findings*

The trial court may order termination of the parent-child relationship under subsection (D) if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," Tex. Fam. Code § 161.001(b)(1)(D),

6

and under subsection (E) if the evidence establishes that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child," *id.* § 161.001(b)(1)(E). Both subsections require proof of "endangerment," which in this context means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Human Servs. v. Bo*yd, 727 S.W.2d 531 (Tex. 1987); *A.C. v. Texas Dep't of Fam. & Protectives Servs.*, 577 S.W.3d 689, 698-99 (Tex. App.—Austin 2019, pet. denied). A showing of endangerment requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but it does not require the Department to show that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Moreover, endangerment does not have to be established as an independent proposition but may instead be inferred from the parental misconduct. *A.C.*, 577 S.W.3d at 699 (citing *Boyd*, 727 S.W.2d at 533).

The focus under subsection (D) is on the child's environment—which includes the child's living conditions and the environment produced by the conduct of the parents or others in the home—and whether the environment itself endangers the child's physical or emotional well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.) (citing *In re M.C.*, 352 S.W.3d 563, 566 (Tex. App.—Dallas 2011, no pet.)). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home is part of the "conditions or surroundings" of the child's home under subsection (D). *V.P.*, 2020 WL 544797, at *4. In addition, unsanitary conditions may qualify as an environment that endangers the physical or emotional well-being of a child. *In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied).

7

Here, the trial court was presented with evidence showing that the family was living in unsafe and unsanitary conditions. In their testimonies, both Rector and Minney described—and the photo exhibits depicted—clutter and debris piled to the ceilings and, in some areas, completely blocking entry to the room. The sleeping space for the children was filled with debris and toys; openly rotting food and roaches were seen throughout the house, including in the refrigerator and in the children's playpen; and "a really bad smell" permeated the entire house. Minney testified that there were dog pads with feces on them in one area of the house and that feces was visibly "hanging off of the sink and some on the floor." When questioned at trial about the condition of the home, the parents did not deny that the photos accurately depicted the condition of the home when the Department removed the children, but Mother disputed the Department's characterization of her home as an unsafe or unsanitary environment for her children.

At trial, Mother and Father testified that since the children's removal, they have cleaned up the home and yard, made minor repairs, and had the home treated by an exterminator. However, the Department caseworker, Lakin Morris, testified that she contacted Mother and Father about viewing the home and that the parents failed to give her access until a few weeks before trial. During this visit, the caseworker was able to view the upstairs portion of the home, which she acknowledged had been cleaned, but the parents denied her access to the downstairs portion of the home and told her that this area was "for storage" and that they were living exclusively in the upstairs portion of the home.

Subsection (E) focuses on the parent's conduct—including acts, omissions, or failures to act— and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child's physical or emotional well-being. *V.P.*, 2020 WL 544797, at *4 (citing *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no

8

pet.)).  In addition, in considering whether a parent's conduct amounts to endangerment under subsection (E), the factfinder may consider conduct that occurred both before and after the Department removed the children from the parent's custody.  *In re S.R.,* 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).  Because it exposes the child to the possibility that the parent may be impaired or imprisoned, it is well established that drug use may support termination under subsection (E).  *In re J.O.A.,* 283 S.W.3d 336, 345 (Tex. 2009); *A.C.*, 577 S.W.3d at 699; *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied).

In this case, both parents admitted to using drugs, including methamphetamines, although they denied ever using drugs in the presence of their children.  Mother also admitted to abusing inhalants, and Father testified that although he was aware that Mother abused inhalants, he did not think it was a problem because "[s]he really doesn't do it in the home" and "keeps it to herself when she does do it."  Moreover, Father told the trial court that his drug use worsened after the children were removed, when he knew he was at risk of losing his parental rights.  Father testified that during this time he used methamphetamine and that he was hospitalized for approximately three weeks due to an overdose of ketamine, a tranquilizer.  Finally, the trial court heard evidence that following the children's removal, Mother failed to appear for seven random drug tests and tested positive once for ecstasy and twice for marijuana and methamphetamine.  Similarly, Father failed to appear for eight drug tests and tested positive for drugs three times, including for methamphetamine.  At the time of trial, both parents claimed to be sober and willing to seek drug treatment.

After considering all the evidence in the light most favorable to the findings, along with any undisputed evidence contrary to the finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father knowingly placed or

9

knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D); *In re A.C.*, 560 S.W.3d at 631. Similarly, a reasonable factfinder could have formed a firm belief or conviction that Father engaged in conduct which endangered his children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(E). Father's first and second issues on appeal are overruled.

Because we have determined that legally sufficient evidence supports the trial court's termination order under subsection (D) and (E), we need not address Father's third and fourth issues on appeal, in which he argues that the evidence is legally insufficient to support the trial court's findings that termination is warranted under subsections (O) and (P). *See In re N.G.*, 577 S.W.3d at 232 (explaining that appellate court may affirm termination judgment by upholding one termination ground under section 161.001(b)(1)); *see also* Tex. R. App. P. 47.1.

### Best-interest Finding

Next, we consider Father's argument that the evidence is factually insufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code § 161.001(b)(2). A determination of whether termination is in the best interest of a child is "child-centered and focuses on the child's well-being, safety, and development." *A.C.,* 560 S.W.3d at 631. A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). To determine whether termination is in a child's best interest we consider the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976), including: (1) the children's wishes; (2) the children's present and future emotional and physical needs;

(3) any emotional and physical danger to the children, now and in the future; (4) the parenting abilities of the person seeking custody; (5) the programs available to assist these individuals in promoting the best interest of the children; (6) the plans for the children by the individual or agency seeking custody; (7) the stability of the proposed home or proposed placement; (8) the parent's acts or omissions that may indicate that the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. The Department is not required to prove all of these factors, and the absence of evidence of some of these factors does not preclude a finding that termination is in the children's best interest, "particularly if the evidence were undisputed that the parental relationship endangered the safety of the child[ren]." *C.H.*, 89 S.W.3d at 27.

In addition to the evidence concerning the condition of the home and the parents' drug use, as previously discussed, the trial court also heard evidence about Father's failure to fully comply with his court-ordered service plan, which required him to take parenting classes, obtain cognitive behavior therapy, receive individual treatment for depression and anxiety, and participate in couple's counseling and family therapy. When asked at trial about his progress in meeting these requirements, Father acknowledged that he had not completed his parenting classes or his individual therapy and that consequently he had not begun any couple's counseling or family therapy. Father explained to the trial court that he was unable to complete his parenting classes because the class times conflicted with his group therapy and because he had a difficult time rescheduling due to COVID restrictions, although the caseworker testified that the classes were available virtually. Father's service plan also allowed him to have supervised visits with his children, and the evidence shows that Father initially regularly attended these visits with

11

Mother, but that when visitation was conducted virtually due to COVID restrictions, beginning in March 2020, Father missed four visits.

The trial court also heard about Father's plans for the children should they be returned to his care. Father is not currently employed but, instead, receives social security disability income and earns some extra income helping his father in his piano-refurbishing business. According to Father, he receives disability income because he has been diagnosed with post-traumatic stress disorder and bipolar disorder. Father explained to the trial court that, in his opinion, the living areas of the home that he shares with Mother are clean and provide enough room for the children and that the yard and patio now provide a safe place for the children to play. He also explained that he and Mother would both be available to take care of the children at home, that the local elementary school is only fifteen minutes from his house, and that he and Mother recently purchased a reliable vehicle for the family. Finally, Father testified that he is now sober, taking his prescribed medication, engaging in cognitive behavioral therapy, and receiving intensive outpatient drug treatment and that he plans to continue with these programs.

Finally, the trial court heard testimony about the children's physical and emotional improvement while in foster care. The trial court heard evidence that when the twins were first removed from their parents' care, A. was exhibiting weakness in his legs and that since removal, both the twins have been receiving occupational therapy. In addition, the trial court heard that Z. and A. were in speech therapy, that C. was in play therapy, and that all the children were doing well and making progress in their respective therapies. The children's foster mother testified that the twins were learning to crawl, that Z. was more talkative than when she first arrived at their home, and that C. has become more affectionate. The foster mother explained that she and her husband have recently added another bedroom and bathroom to their home

12

and that they hoped to adopt all four children. The caseworker testified that based on her observations, the children appear to be happy and have bonded with their foster parents and that it was in the children's best interest to terminate Father's and Mother's parental rights.

Having considered the entire record and weighing disputed evidence contrary to the trial court's finding against all evidence favoring the finding, we conclude that the trial court reasonably could have formed a firm belief or conviction that termination of Father's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 631. Because the evidence is factually sufficient to support the trial court's best-interest finding, we overrule Father's fifth issue on appeal.

### Mother's Appeal

Having overruled Father's issues on appeal, we turn to Mother's appeal. As previously discussed, Mother's court-appointed attorney has filed an *Anders* brief, concluding that the appeal is frivolous. *See Anders,* 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeal from termination of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Reg. Servs.*, 160 S.W.3d 641, 646-47 (Tex. App.— Austin 2005, pet. denied). Mother's counsel has certified to this Court that he has provided Mother with a copy of the *Anders* brief and advised her of her right to examine the appellate record and to file a pro se brief. To date, Mother has not filed a pro se brief. After conducting an independent review of the record, including the *Anders* brief submitted on Mother's behalf, we agree with counsel's conclusion that the appeal is frivolous and without merit.

## CONCLUSION

We affirm the trial court's final order of termination. Counsel's motion to withdraw is denied.[2]

_____

Chari L. Kelly, Justice

Before Chief Justice Rose, Justices Baker and Kelly

Affirmed

Filed: December 17, 2020

---

[2] The Texas Supreme Court has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). Accordingly, counsel's obligation to R.V. has not yet been discharged. *See id.* If R.V., after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27-28.

14